IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

OSAMA ABDELHAMID,                        )
                                         )
            Plaintiff,                    )
                                         )
    v.                                   )        Civil Action No. 1:24-cv-1553 (RDA/IDD)
                                         )
SUMMIT RIDGE ENERGY, LLC,                )
                                         )
            Defendant.                   )
                                         )
                                         )
_____)

## MEMORANDUM OPINION AND ORDER

This matter comes before the Court on Defendant Summit Ridge Energy, LLC's Motion to Dismiss the Amended Complaint (the "Motion"). Dkt. 15. Considering the Motion, the Amended Complaint (Dkt. 14), Defendant's Memorandum in Support (Dkt. 16), Plaintiff's Opposition (Dkt. 23), and Defendant's Reply (Dkt. 24), the Court GRANTS the Motion for the reasons that follow.

## I. BACKGROUND[1]

### A. Factual Background

*Pro se* Plaintiff Osama Abdelhamid is an Egyptian national and a practicing Muslim. Dkt. 14 ¶ 2. Defendant is a solar energy developer and operator. *Id.* ¶ 5. Defendant hired Plaintiff as a Contracts Manager to assist the company in improving its contracting processes. *Id.* ¶¶ 1, 4. Defendant was aware of Plaintiff's national origin and religion, as it received documentation of

---

[1] For purposes of considering the instant Motion to Dismiss, the Court accepts all facts contained within the Amended Complaint as true, as it must at the motion-to-dismiss stage. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

1

Plaintiff's foreign place of birth during hiring and Plaintiff told Defendant's leadership about his religious-based abstention from alcohol. *Id.* ¶ 2.

In the first few months of his employment, Plaintiff identified areas for improvement in Defendant's (1) contract template and (2) platform for managing requests for proposal ("RFP") and bidder communications. *Id.* ¶¶ 13–14, 16. Plaintiff proposed several changes to align Defendant's practices with industry standards. *Id.* ¶¶ 14, 16.

As to the contract template, Mike Dillon, Plaintiff's immediate superior, rejected Plaintiff's proposal for a two-document contract format, noting that he preferred "investors to have everything in one document" and that Plaintiff's proposal was not standard for solar projects. *Id.* ¶ 15. In the alternative, Plaintiff proposed changes to the existing single-document form, but Dillon also rejected that proposal, citing timing pressures and investor deadlines. *Id.* Despite these assertions of fixed due dates, Plaintiff did not witness a single instance in which Defendant met those deadlines. *Id.* Additionally, even though Dillon rejected his proposal, Plaintiff nonetheless created a revised single-document template before he was terminated. *Id.*

As to the management platform, Dillon approved Plaintiff to explore his proposed platform but instructed that no financial information could be stored in the platform, citing privacy concerns. *Id.* ¶ 16. Dillon also refused to provide the platform agreement to Plaintiff for his review, stating that the agreement was handled only by the CEO. *Id.* Despite Plaintiff noting that this rationale conflicted with standard privacy practices, the restriction remained, which rendered the platform impractical for bidding and pre-award contracting. *Id.* Dillon later approved Plaintiff's request for a different management platform but not until Plaintiff explained the platform to Steven

2

Bilheimer—a former peer-turned-supervisor of Plaintiff—who then explained it to Dillon.[2]  *Id.*
¶ 18.

In his first or second month of employment, Plaintiff joined Dillon and Raj Soi—Executive
Vice President of Operations for Defendant—on a business trip to Chicago to meet prospective
contractors.  *Id.* ¶ 17.  Plaintiff informed his colleagues that he abstained from drinking alcohol for
religious reasons.  *Id.*  Subsequent socializing centered on "alcohol-forward activities (cocktails,
'Old Fashioned' kit discussions) and golf/pool parties," which Dillon favored.  *Id.*

After this, Plaintiff was not invited to attend a contractor dinner.  *Id.*  This dinner was with
a contractor who was a close friend of Defendant's CEO.  *Id.*  Despite Plaintiff's role as lead of
contractor RFPs and contract terms, and despite Plaintiff having been assigned to draft contracts
for that contractor's projects, only Dillon and Bilheimer attended the dinner.  *Id.*  Plaintiff alleges
that his exclusion from this dinner impaired his ability to build relationships with bidders as needed
for his job and undermined Plaintiff's role.  *Id.*

Dillon also repeatedly told Plaintiff not to alter the daily preconstruction tracking
spreadsheet because he needed it in a particular format.  *Id.* ¶ 18.  When Bilheimer later criticized
Plaintiff for using that format, Dillon permitted Bilheimer's version and faulted Plaintiff.  *Id.*

Plaintiff also alleges that an individual named "Jimmy," who was hired the same day as
Plaintiff, had a Director title but fewer years of experience.  *Id.*  Plaintiff asserts that Jimmy was
tasked with a self-performance initiative that never launched during Plaintiff's time at Defendant
and often had a "limited workload."  *Id.* ¶ 19.  Dillon repeatedly directed Plaintiff to assist this
individual.  *Id.*  Nonetheless, the individual remained employed.  *Id.*

---

[2] Defendant noted that Plaintiff misspelled Bilheimer as "Belheimer" in the Amended
Complaint.  Dkt. 16 n.2.  Plaintiff appears to have adopted the spelling "Bilheimer" in his
Opposition.  Dkt. 23.  Accordingly, the Court uses "Bilheimer."

In December 2023, Defendant placed Plaintiff on a Performance Improvement Plan ("PIP"). *Id.* ¶ 21. At the outset of the meeting, Plaintiff stated that, while he acknowledged a few minor mistakes in documents, those occurred because he complied with Dillon's and Bilheimer's specific directions to maintain multiple different templates and to perform manual edits, which Plaintiff had warned would impose an unreasonable, error-prone burden on him alone. *Id.* Plaintiff further noted that, when Dillon and Bilheimer undertook the same tasks, they were not immune from similar mistakes. *Id.* Plaintiff was required to sign the PIP without time to review and was never provided a copy during employment or at off-boarding, despite multiple requests. *Id.* Defendant's Human Resources ("HR") later refused to provide a copy, claiming it was a "company/business work product." *Id.* No performance coaching or written feedback followed during the PIP period. *Id.*

In the final days of Plaintiff's employment, Bilheimer sent multiple emails asserting that deadlines were not being met, even though Plaintiff and Bilheimer were speaking daily on morning calls and Bilheimer had directed Plaintiff to reprioritize work. *Id.* ¶ 20. Plaintiff alleges the cited deadlines were neither real nor realistic. *Id.* One prioritized task, finalizing the review and production of a final draft for a contractor (a task originally assigned to Bilheimer), also went unsigned past the stated due date. *Id.* That week, while Bilheimer worked from a desk adjacent to Plaintiff, he observed firsthand that the mandated manual workflow was inefficient and time-consuming; when he attempted to perform the work himself, he requested Plaintiff's assistance to complete it. *Id.*

On February 6, 2024, Defendant terminated Plaintiff for alleged "performance issues." *Id.* ¶ 22. HR communications focused on benefits and off-boarding. *Id.* Two to three weeks later, HR refused again to provide a copy of the PIP to Plaintiff. *Id.*

Plaintiff alleges that Dillon and Bilheimer "knew or should have known of Plaintiff's national origin and religion (from hiring documents and Plaintiff's explicit statements about not consuming alcohol for religious reasons)." *Id.* ¶ 24. And Plaintiff alleges that "Jimmy" and Bilheimer, who are neither Egyptian nor Muslim, were not placed on a PIP, nor were they "subject to the same undermining of approved tools/forms and were not excluded from contractor relationship-building events." *Id.* ¶ 23.

### B.  Procedural Background

Plaintiff filed his initial Complaint on September 4, 2024. Dkt. 1. On September 29, 2025, this Court granted-in-part and denied-in-part Defendant's first motion to dismiss. Dkt. 13. The Court granted the motion insofar as Plaintiff failed to state a claim but denied the motion insofar as Defendant sought to dismiss for insufficient service. *Id.* This Court then allowed Plaintiff to file an Amended Complaint. *Id.*

Plaintiff filed his Amended Complaint on October 20, 2025. Dkt. 14. Defendant filed the instant Motion to Dismiss on November 3, 2025. Dkt. 15. Plaintiff opposed the Motion on November 24, 2025. Dkt. 23. Defendant filed its reply on December 1, 2025. Dkt. 24.

## II.  LEGAL STANDARD

To survive a motion to dismiss brought under Federal Rule of Civil Procedure 12(b)(6), a complaint must set forth "a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleaded factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). When reviewing a motion brought under Rule 12(b)(6), a court "must accept as true all of the factual allegations contained in the complaint," drawing "all reasonable inferences" in the plaintiff's

favor. *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted). "[T]he court 'need not accept the [plaintiff's] legal conclusions drawn from the facts,' nor need it 'accept as true unwarranted inferences, unreasonable conclusions, or arguments.'" *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 616 n.26 (4th Cir. 2009) (quoting *Kloth v. Microsoft Corp.*, 444 F.3d 312, 319 (4th Cir. 2006)). Additionally, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. Generally, courts may not look beyond the four corners of the complaint in evaluating a Rule 12(b)(6) motion, *see Goldfarb v. Mayor & City Council of Baltimore*, 791 F.3d 500, 508 (4th Cir. 2015), but they "may consider documents . . . attached to the motion to dismiss, as long as they are integral to the complaint and authentic[,]" *Sec'y of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007).

## III.  ANALYSIS

Plaintiff asserts two disparate treatment claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) *et seq.* ("Title VII"): one for national origin discrimination (Count I), and the other for religious discrimination (Count II). Dkt. 14 at 6. Defendants move to dismiss based on lack of timeliness, failure to exhaust, and failure to state a claim. Dkt. 15 at 1. The Court addresses each argument in turn.

### A.  Timeliness

As a preliminary matter, to maintain a cause of action under the antidiscrimination statutes, a plaintiff must generally bring suit within 90 days of the receipt of a right to sue letter from the Equal Employment Opportunity Commission ("EEOC"). Here, Defendant argues that Plaintiff did not timely file his Complaint within ninety days of receiving his EEOC Right to Sue Letter ("Letter"). Dkt. 16 at 12. In Plaintiff's original Complaint, he alleged that he received the Letter

on June 6, 2024. Dkt. 1 at 5. He then filed his Complaint ninety days later, on September 4, 2024. *Id.* at 1. Thus, it appears Plaintiff's Complaint was timely filed. Although Plaintiff did not reassert this specific allegation in his Amended Complaint, alleging only that the Letter was "issued" in "early June 2024," Dkt. 14 ¶ 8, the Court finds that dismissal on this basis at this stage would be inappropriate based on the record before it and considering Plaintiff's *pro se* status where he was not warned that any amended complaint would thereafter be the only operative complaint before the Court. Accordingly, the Motion will be denied as to this ground.

### B. Exhaustion of Administrative Remedies (as to Count II)

Prior to filing suit, Title VII requires a plaintiff to exhaust his administrative remedies by filing a discrimination charge with the EEOC within 300 days after the alleged discrimination occurred. *See Perkins v. Int'l Paper Co.*, 936 F.3d 196, 207 (4th Cir. 2019). A plaintiff's suit is limited to the scope of his EEOC charge, and a plaintiff may advance only "claims in her judicial complaint [that] are reasonably related to her EEOC charge and can be expected to follow from a reasonable administrative investigation." *Smith v. First Union Nat. Bank*, 202 F.3d 234, 247 (4th Cir. 2000).

Here, Plaintiff's EEOC charge alleged that he was discriminated against only "on the basis of [his] National Origin (Egyptian)." Dkt. 1-2 at 3; *see* Dkt. 14-1 (incorporating charge by reference to Amended Complaint). Plaintiff's religion is not mentioned in the charge, and none of Plaintiff's allegations in the charge can reasonably be read to relate to his religion.[3] *Id.* at 2-3.

---

[3] The particulars of the charge in their entirety are alleged as follows:

On June 24, 2023, I was hired by Summit Ridge Energy in the position of Contracts Manager.

Mike Dillon, my direct supervisor and Vice President of Pre-Construction, was promoted to Senior Vice President of Operations, in August 2023. Consequently,

Nonetheless, Plaintiff argues that, because his "Egyptian origin and Muslim faith were intertwined," his religious discrimination claim has been exhausted. Dkt. 23 at 4. Not so. Under Title VII, national origin and religion "are 'ideologically distinct.'" *Sarraj v. N. Va. Elec., Coop.*, 2022 WL 2820553, at *6 (E.D. Va. July 18, 2022) (quoting *Kun v. Finnegan, Henderson, Farabow, Garrett & Dunner*, 949 F. Supp. 13, 19 (D.D.C. 1996)); *see also Guthrey v. Ca. Dep't of Corr. & Rehab.*, 2012 WL 2499938, at *6 n.2 (E.D. Cal. June 27, 2012) ("'Muslim,' however, does not represent race, ancestry, or national origin. Rather, a Muslim is an individual who is a believer in or adherent of the Islamic faith."). Therefore, Plaintiff's religious discrimination claims are not reasonably related to his EEOC charge, particularly where the charge alleged no specific factual allegations about Plaintiff's alleged national origin discrimination that could show any interconnection with his religion. *See Kun*, 949 F. Supp. at 19 (D.D.C. 1996) (recognizing that the "legislative history of [Title VII] enunciates precisely that a person's national origin has nothing to do with color, religion, or race"). Accordingly, Plaintiff's failure to plead religious

---

> Mr. Dillon chose Steven Belheimer as the new VP of Pre-Construction. Both Mr. Dillon and Mr. Belheimer consistently imposed unrealistic and unnecessary deadlines just to prove I had performance issues. Throughout my time in Summit Ridge Energy, I was deliberately and intentionally hindered from making improvements on the work process to remove the manual, time consuming tasks to make the work more efficient, easier to track and manage, and increase the productivity rate. In December 2023, I was placed on a Performance Improvement Plan (PIP). I was only able to skim through the PIP quickly before signing, it did not have any S.M.A.R.T. goals, it was to end on January 26th, 2024, and I would have weekly meetings to receive feedback and discuss the progress of the PIP. I requested multiple times a copy of the PIP and was never given one nor did I have the weekly meetings mentioned. On February 6th, 2024, I was terminated due to performance issues even though I never received any feedback regarding my performance under the PIP.
>
> I believe I was discriminated against on the basis of my National Origin (Egyptian), in violation of Title VII of The Civil Rights Act of 1964, as amended.

Dkt. 1-2 at 2-3.

discrimination or facts reasonably related to religious discrimination in his EEOC charge precludes him from now asserting claims for religious discrimination in his Amended Complaint and his religious discrimination claim (Count II) will be dismissed for failure to exhaust.

### C.   Failure to State a Claim (as to Count I)

The Court thus turns to whether Plaintiff has stated a claim as to national origin discrimination. Where, as here, a plaintiff does not rely on allegations of direct discrimination, he needs to allege facts that plausibly support inferences of the elements of his discrimination claim, which typically involves asserting the elements of a *prima facie* case of discrimination: "(1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class." *Coleman v. Maryland Ct. of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010) (citing *White v. BFI Waste Servs., LLC*, 375 F.3d 288, 295 (4th Cir.2004)), *aff'd sub nom. Coleman v. Ct. of Appeals of Maryland*, 566 U.S. 30 (2012). Ultimately, to survive a motion for to dismiss, Plaintiff must allege facts sufficient to establish a reasonable inference of discrimination. *See Ali v. BC Architects Eng'rs, PLC*, 832 F. App'x 167, 171 (4th Cir. 2020) (discussing whether allegations are sufficient to support a reasonable inference of discrimination sufficient to support a motion to dismiss).

In its Motion, Defendant concedes that Plaintiff sufficiently pleaded he is a member of a protected class and experienced an adverse employment action—prongs one and three of the *prima facie* case, respectively. Dkt. 16 at 7. However, Defendant asserts that Plaintiff has not sufficiently pleaded facts to satisfy the second and fourth elements: satisfactory job performance and different treatment from similarly situated employees outside of Plaintiff's protected class, *i.e.*, comparators. *Id.* at 7–10. And Defendant asserts that Plaintiff has ultimately not alleged facts

9

sufficient to support a reasonable inference of discrimination on the basis of his national origin. *Id.* at 11.

### i.   Satisfactory Job Performance

As to satisfactory job performance, a plaintiff does not need to show "he was a perfect or model employee" to establish satisfactory job performance. *Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 225 (4th Cir. 2019). However, a plaintiff must show "that he was qualified for the job *and* that he was meeting his employer's legitimate expectations." *Id.* (emphasis added). Importantly, when assessing job performance, "[i]t is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff." *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 960–61 (4th Cir. 1996).

In his Amended Complaint, Plaintiff alleges no facts indicating that he was meeting Defendant's legitimate expectations. Indeed, the allegations indicate that Plaintiff's job was to assist Defendant in improving its contracting processes, but Defendant's supervisors repeatedly found Plaintiff's suggestions to be unworkable or otherwise unresponsive to its needs. *See, e.g.*, Dkt. 14 ¶¶ 15, 16. Plaintiff also alleges that, after one of his proposals was rejected, he continued to work on it anyway. *Id.* ¶ 15. And Plaintiff alleges that he admitted that he had made mistakes, albeit allegedly "minor" ones, in work documents when he received his PIP. *Id.* Although Plaintiff alleges that one of his proposals was ultimately accepted, Dkt. 14 ¶¶ 16, 18, this single alleged success occurred only after Plaintiff, who was initially rejected, better explained the substance of his proposal. *Cf. Pettis v. Nottoway Cnty. Sch. Bd.*, 980 F. Supp. 2d 717, 727 (E.D. Va. 2013) ("An employee may establish that he was meeting his employer's expectations by: (1) pointing out concessions by his employer that he was performing satisfactorily at the time of the dismissal; (2) offering evidence of his prior satisfactory performance reviews; or (3) providing expert

testimony as to the employer's performance expectations and an analysis of his performance in light of those expectations."), *aff'd*, 592 F. App'x 158 (4th Cir. 2014).[4] Accordingly, Plaintiff has failed to sufficiently allege this element of the *prima facie* case and his national origin discrimination claim will be dismissed on this basis.

### ii.   Similarly Situated Comparators

Although a plaintiff is not required to identify a comparator to prove a discrimination claim, if he does rely on comparators, he must show that he and the alleged comparators are "similarly situated in all material respects." *Tinsley v. City of Charlotte*, 854 F. App'x 495, 500 (4th Cir. 2021). Specifically, a plaintiff and comparators are similarly situated when they "dealt with the same supervisor," were "subject to the same standards," and "engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Haywood v. Locke*, 387 F. App'x 355, 359 (4th Cir. 2010). Here, Plaintiff asserts that Jimmy and Bilheimer are similarly situated comparators.

As to Jimmy, Plaintiff alleges that he and Jimmy had the "same reporting line." Dkt. 14 ¶ 12. However, it is not clear that Plaintiff and Jimmy were "subject to the same standards" when it came to evaluating their work, as Plaintiff pleads that they had different titles and responsibilities: Plaintiff was a Manager hired to "professionalize and scale preconstruction contracting," while Jimmy was a Director with a "narrower scope of work" who was hired to "develop SRE's self-performance program." *Id.* ¶¶ 11, 12. Moreover, although Plaintiff alleges that Jimmy's main project did not launch during Plaintiff's tenure, *id.* ¶ 19, and that Plaintiff's supervisor "repeatedly" directed him to assist Jimmy with various minor projects, *id.* ¶ 19, these

---

[4] Plaintiff notes that Bilheimer, who ultimately obtained approval for Plaintiff's recommendation, was of a different national origin. But, as discussed further *infra*, Bilheimer is not an appropriate comparator, where Bilheimer was also Plaintiff's supervisor. Dkt. 14 ¶ 18.

11

allegations do not show that Jimmy engaged in the same alleged conduct for which Defendant asserted Plaintiff was placed on a PIP and later terminated. Plaintiff does not allege that Jimmy had missed any deadlines relating to his main project—only that it had not yet been launched before Plaintiff was terminated. Nor does Plaintiff allege Jimmy had made similar mistakes in documents to the ones that were discussed at Plaintiff's PIP meeting. Accordingly, Jimmy is not similarly situated in all material respects and is thus not an appropriate comparator as alleged.

As to Bilheimer, although Plaintiff alleges that they initially reported to the same supervisor, all of the relevant allegations about Bilheimer's performance describe conduct that occurred after Bilheimer was promoted to be Plaintiff's supervisor. *See id.* ¶ 12. Accordingly, Plaintiff has not alleged sufficient facts to plausibly show that, at the relevant times, Bilheimer had the same immediate supervisor or was subject to the same standards. Moreover, although Plaintiff alleges that when Bilheimer attempted to take on some of Plaintiff's tasks during the final days of Plaintiff's employment Bilheimer was "not immune from similar mistakes," *id.* ¶ 21, the circumstances of these mistakes are not plausibly alleged to be the same where these tasks were not alleged to be part of Bilheimer's job responsibilities at the time but were rather an attempt to complete Plaintiff's tasks in the days leading up to Plaintiff's termination. And, in any event, Plaintiff does not allege that Bilheimer had missed any deadlines or that his supervisors had repeatedly found his proposals to be unworkable or otherwise unresponsive to the company's needs. Thus, Bilheimer is also not an appropriate comparator as alleged.

Accordingly, Plaintiff has not sufficiently pleaded an inference of discrimination through his proposed comparators because neither comparator is similarly situated in all material respects. Thus, Plaintiff's national origin claim will also be dismissed on this basis.

### iii.  Inference of Discrimination

Looking beyond the asserted comparators, Plaintiff has ultimately not pled facts that support an inference of discrimination on the basis of national origin.  Plaintiff's allegations with respect to national origin discrimination are entirely conclusory.  Indeed, Plaintiff has merely speculated that Dillon and Bilheimer "should have known" his national origin based on hiring documents; Plaintiff does not plead that they *did* know his national origin.  Dkt. 14 ¶ 24; *see also* Dkt. 13 (order dismissing prior complaint in part because Plaintiff did "not even allege that his purportedly biased supervisors were aware of his national origin").  Although Plaintiff now asserts in his Opposition that Dillon was one of the senior leaders who interviewed and hired Plaintiff—and thus must have reviewed Plaintiff's resume showing education and early professional experience in Egypt and his work authorization reflecting a foreign place of birth—any involvement by Dillon in the interview process, including what he may or may not have been provided to review, is not pleaded in the Amended Complaint.  *See Oku v. Trumbull Ins. Co.*, 2026 WL 801263, at *3 (E.D. Va. Mar. 23, 2026) ("[I]t is axiomatic that a Plaintiff may not amend her complaint through an opposition brief.").

Furthermore, none of Plaintiff's allegations of disparate treatment appear to have any non-conclusory connection to his national origin.  As this Court explained in dismissing Plaintiff's prior complaint, Plaintiff must allege more than unfair treatment to maintain a claim under Title VII—he must plausibly allege that such unfair treatment was based on his national origin.  *Cox v. Rumsfeld*, 369 F. Supp. 2d 748, 758 (E.D. Va. 2005) (recognizing that "personality conflicts and unfair treatment arise routinely in employment relationships" and are not alone sufficient to state a claim under the antidiscrimination statutes).  Plaintiff has not done so here.  At bottom, Plaintiff's allegations with respect to national origin boil down to Plaintiff being of a particular national

13

origin, his supervisors being of another, and Plaintiff being terminated; this is not enough to create a plausible inference of discrimination. Accordingly, Plaintiff's national origin discrimination claim will also be dismissed on this basis.

### IV. CONCLUSION

For the forgoing reasons, the Court will dismiss the Amended Complaint. Thus, the Court must assess whether to permit further amendment. Here, Plaintiff has had the benefit of the Court's prior Memorandum Opinion and Order, which specifically addressed his failure to state a claim and provided information regarding what would be necessary to state a claim for national origin discrimination. Plaintiff has again failed to do so, and it appears that permitting further amendment would be futile. Although Plaintiff suggests that he could perhaps add additional allegations regarding Dillon's knowledge of his national origin, that would not cure the deficiencies as to lack of an inference of discrimination noted here. Moreover, Plaintiff does not suggest that there are other allegations that Plaintiff could add that would cure the deficiencies noted as to the other elements of the *prima facie* case, and the dearth of allegations in the EEOC Charge, his original Complaint, and the Amended Complaint all suggest that there are no additional facts for Plaintiff to allege in good faith that could cure these deficiencies.

\* \* \*

Accordingly, for the foregoing reasons, it is hereby

ORDERED that Defendant's Motion to Dismiss (Dkt. 15) is GRANTED; and it is

FURTHER ORDERED that Plaintiff's Amended Complaint (Dkt. 14) is DISMISSED with prejudice.

To appeal this decision, Plaintiff must file a written notice of appeal with the Clerk of Court within 30 days of the date of entry of this Order. A notice of appeal is a short statement indicating

14

a desire to appeal, including the date of the order that Plaintiff wants to appeal. Plaintiff need not explain the grounds for appeal until so directed by the court of appeals. Failure to file a timely notice of appeal waives Plaintiff's right to appeal this decision.

The Clerk is directed to send a copy of this Order to *pro se* Plaintiff Osama Abdelhamid at his address of record and directed to place this matter among the ended causes.

It is SO ORDERED.

Alexandria, Virginia
May _12_, 2026

/s/
_____
Rossie D. Alston, Jr.
United States District Judge

15